IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 7, 2017

**STATE OF TENNESSEE v. ANTONIO JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 15-05615        W. Mark Ward, Judge**

_____

**No. W2017-00476-CCA-R3-CD**

_____

The Shelby County Grand Jury indicted Defendant, Antonio Johnson, on charges of attempted first degree murder, employing a firearm in the commission of a dangerous felony, reckless endangerment with a deadly weapon, and three counts of aggravated assault; the State later dismissed two of the aggravated assault counts. The jury convicted Defendant of attempted second degree murder, employment of a firearm in the commission of a dangerous felony, aggravated assault, and reckless endangerment with a deadly weapon. The trial court sentenced Defendant to eleven years for the attempted second degree murder conviction, six years for the aggravated assault conviction, six years for the employment of a firearm during the commission of a dangerous felony conviction, and two years for the reckless endangerment conviction. The trial court ordered the sentences for aggravated assault and reckless endangerment to run concurrently with each other and ordered the remaining sentences to run consecutively, for an effective sentence of twenty-three years. On appeal, Defendant argues that (1) the evidence was insufficient for a rational juror to have found him guilty of attempted second degree murder beyond a reasonable doubt; (2) the trial court erred in allowing the admission of testimony regarding Defendant's past fight with one of the victims; (3) the trial court erred in allowing the admission of a surveillance video; and (4) the trial court erred in ordering partial consecutive sentencing. After a thorough review of the facts and law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Jennifer D. Fitzgerald, Memphis, Tennessee, for the appellant, Antonio Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Sarah Poe, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

**Jury Trial**

Kyerra Floyd testified that June 14, 2015, was her ex-boyfriend, Larry Campbell's, birthday. She stated that she and Mr. Campbell were "just chilling" and later went to the Yellow Store. As Ms. Floyd and Mr. Campbell were leaving the Yellow Store, a man appeared and said, "[W]hat's up, b***h." She and Mr. Campbell turned around, and the man "pulled a gun" on them. Ms. Floyd stated that she was scared and that Mr. Campbell grabbed her and moved her to the side. She stated that Mr. Campbell was speaking to the man with the gun, who was circling them. Ms. Floyd and Mr. Campbell fell, and the man shot Mr. Campbell. Ms. Floyd testified that Mr. Campbell was shot in the shoulder.

On cross-examination, Ms. Campbell agreed that she gave a statement to police and that she could not identify the individual who shot Mr. Campbell at trial. She agreed that she described the shooter to the police as a 5' 7" man wearing a white shirt with a Nike symbol on it. She testified that, when she and Mr. Campbell fell, she did not try to push the shooter out of the way. Ms. Floyd then agreed that her statement disclosed that, while she attempted to push the shooter off of Mr. Campbell, the shooter shot Mr. Campbell in the chest.

Officer Richard Griffin testified that he had worked as a police officer for the Memphis Police Department for approximately five and one-half years. On June 14, 2015, Officer Griffin was stationed at the North Main Station and responded to a shooting on Mississippi Street. When he arrived, Officer Griffin observed a man lying in the median who had been shot in the neck area. On cross-examination, Officer Griffin stated that the scene was "fairly crowded," but he did not observe anyone running from the scene. He stated that he found one shell casing at the scene and that he spoke with four witnesses. These witnesses informed Officer Griffin that the shooter walked with Ms. Floyd and Mr. Campbell on the sidewalk and then attempted to pistol whip Mr. Campbell.

Sergeant John Stone testified that he was assigned to the Crime Scene Investigative Unit with the Memphis Police Department. On June 14, 2015, Sergeant

- 2 -

Stone responded to the scene of the offense and observed "several items of interest" in the middle of the street, including a shell casing and "a red substance which appeared to be blood." Sergeant Stone stated that he did not recover a gun at the offense scene. On cross-examination, Sergeant Stone testified that he searched "[t]he immediate area" and "both sides of the street" for a gun. He also noted that other officers secured the offense scene with yellow barrier tape and searched for evidence.

Sergeant Alyssa Macon-Moore testified that she was currently employed in the Internal Affairs Bureau of the Memphis Police Department, but on June 14, 2015, she was assigned to the North Main Station General Investigative Bureau. On that day she was advised that a shooting had occurred on Mississippi Street, and she became the lead investigator for the case. Sergeant Macon-Moore explained that she "reviewed the case and then [she] began to try to call witnesses and try to talk to [the] victim of that particular case." She stated that she spoke with Mr. Campbell several days later because he was unable to speak with her while he was hospitalized. Sergeant Macon-Moore testified that she investigated whether any nearby video surveillance recorded the offense and found that two businesses and the Realtime Crime Center recorded the offense. Sergeant Macon-Moore collected the video recordings. She also created a photographic identification spread to show Mr. Campbell, who identified Defendant as the shooter in "probably less than [ten] seconds."

On cross-examination, Sergeant Macon-Moore testified that she did not interview Defendant during her investigation. She explained that she "made an attempt to locate [Defendant][]" but that she and other officers helping in the search were unable to locate him. Sergeant Macon-Moore agreed that, when she attempted to interview Mr. Campbell in the hospital, he told her that he had never seen the shooter before. She noted that she asked Mr. Campbell one question, but she stopped questioning him after the nurse informed her that Mr. Campbell was heavily sedated. Sergeant Macon-Moore also agreed that another officer had received information that an individual named Marcus Johnson was the shooter; she was unable to locate Mr. Johnson. Sergeant Macon-Moore also agreed that, in her investigation, she learned that a black semi-automatic handgun was involved in the offense, but she was also unable to locate the handgun.

Larry Campbell testified that on June 14, 2015, he celebrated his birthday by watching a sports game; later, he walked to the Yellow Store, with Ms. Floyd. Mr. Campbell stated that, as he was walking to the Yellow Store, people wished him a happy birthday. He saw Defendant standing outside the Yellow Store, and he said "[W]hat's up[?]" to Defendant. After exiting the Yellow Store, Mr. Campbell was walking when he heard someone say his name. He turned around and saw Defendant "standing down the street." Defendant walked up to Mr. Campbell and Ms. Floyd and said "What's up now, b***h." At this point, Mr. Campbell did not recognize Defendant, but he knew

Defendant was speaking to him. When Defendant walked past the Yellow Store, he pulled "a big black gun" on Mr. Campbell. Mr. Campbell stated that Ms. Floyd was standing in front of him, and they both began to walk backwards down the street as Defendant said, "It's over. It's over now. It's over now." As he walked backwards, Mr. Campbell told Defendant that he could have everything in Mr. Campbell's pockets, and Ms. Floyd informed Defendant that Mr. Campbell was a father and that it was his birthday. Defendant told Ms. Floyd to move, but she did not, so Defendant picked up a glass bottle and tried to hit her with it. Mr. Campbell attempted to keep Ms. Floyd from being hit by the bottle, and they both fell to the ground. Mr. Campbell stood up and attempted to reach for the gun when Defendant shot him in his collar bone. Mr. Campbell testified that the gunshot wound paralyzed his whole right side. He stated that, due to therapy, he can walk again. He explained that he worked as a barber and that he was trying to relearn his skills using his left hand.

Mr. Campbell identified the Yellow Store and Mike's Store on a surveillance video recording. Mr. Campbell then identified himself and Ms. Floyd on video surveillance recording. He also identified the individual who walked up to him, spoke to him, and later shot him. The State produced a second video of surveillance footage from the Yellow Store, and Mr. Campbell again identified himself, Ms. Floyd, and the shooter. Mr. Campbell also identified a third recording of video surveillance from Mike's Store; he stated that Mike's Store was next to the Yellow Store. Mr. Campbell identified Defendant on the video as the individual who shot him. After he was shot, Mr. Campbell was taken to the hospital for treatment. He later gave a statement to police after he was discharged from the hospital and identified Defendant as the shooter from a photographic identification spread.

On cross-examination, Mr. Campbell stated that, while he saw the face of the individual who shot him during the offense, he did not know the individual's name until his family showed him a picture of Defendant, and he recognized Defendant as the shooter. Mr. Campbell did not recall seeing Sergeant Macon-Moore at the hospital or telling her that he had never seen the shooter before. He explained that the police showed him a photographic identification spread approximately two days after he was discharged from the hospital. He also stated that he was attempting to reach for the gun when Defendant shot him.

After a *Momon* hearing, Defendant decided against testifying. The jury found Defendant guilty of attempted second degree murder, employment of a firearm in the commission of a dangerous felony, aggravated assault, and reckless endangerment with a deadly weapon.

**Sentencing Hearing**

At a subsequent sentencing hearing, Shawanda Jones testified that she is Defendant's mother. She stated that Defendant was the oldest of her children and that he "help[ed] [her] with [her] other kids no matter what the situation [wa]s." She stated that Defendant was "ready to get out here and make a change to show the world he's got kids he want[s] to take care of." Ms. Jones stated that, prior to the offense, Defendant worked at Cooper Moving Company and for Federal Express. She testified that Defendant had a good relationship with his two children and that he talked to them frequently on the phone. Ms. Jones believed that Defendant started getting into trouble as a child because Defendant was very close to his grandfather, and when his grandfather passed away, Defendant "just couldn't accept it that he was gone." She explained that her father, Defendant's grandfather, was disabled and that Defendant helped take care of his grandfather as a child. On cross-examination, Ms. Jones stated that her father passed away in 2005, when Defendant was ten or eleven. She agreed that Defendant had previously been convicted of four counts of aggravated robbery.

The trial court found that Defendant was a Range I standard offender and that the trial court was required to sentence Defendant to six years at 100% for the conviction of employing a firearm during a dangerous felony. The trial court stated that it had considered "the evidence presented, both at the trial and at the sentencing hearing the pre-sentence report and the principles of sentencing established by the 1989 Act and arguments relative to possible alternatives to incarceration[]" as well as "the nature and characteristics of the criminal conduct involved, any enhancement and mitigation factors that apply to the case, any statistical information provided by the Administrative Office of the Courts and any statement [Defendant] wishe[d] to make on his . . . behalf." The trial court also noted that Defendant's sentences "should be consistent with the general purposes and principles of sentencing set forth in the 1989 Act[,]" such as "the imposition of a sentence justly deserved in relation to the seriousness of the offense, a punishment sufficient to prevent crime and promote respect for the law and consideration of the [D]efendant's potential or lack of potential for rehabilitation."

Regarding enhancement factors, the trial court found that Defendant "ha[d] a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." The trial court noted that Defendant had previously been convicted of reckless endangerment, criminal trespass, and theft. The trial court also found that "the personal injuries inflicted upon the victim were particularly great[]" because the victim's right side was paralyzed after the offense. The trial court additionally found that, prior to trial or sentencing, Defendant "failed to comply with the conditions of a sentencing involving release into the community," that Defendant was on probation at the time he committed the offense, and that he had

previously been "adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed as an adult." Regarding mitigating factors, the trial court noted that Defendant "ha[d] not testified or offered any apology or remorse or anything." However, the trial court considered Defendant's childhood experience. The trial court sentenced Defendant to eleven years for attempted second degree murder, six years for aggravated assault, six years for employment of a firearm during the commission of a dangerous felony, and two years for reckless endangerment with a deadly weapon. The trial court ordered the aggravated assault and reckless endangerment convictions to run concurrently to each other but consecutively to the attempted second degree murder conviction. The trial court ordered the employment of a firearm conviction to run consecutively to the other three sentences for a total effective sentence of twenty-three years.

Regarding its order of partial consecutive sentencing, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and who showed no hesitation about committing a crime to which the risk to human life was high. The trial court found that the circumstances of Defendant's offenses were aggravated because Defendant "essentially" chased the victims down and then stood over them and shot Mr. Campbell. The trial court found that consecutive sentencing was justified "because confinement for an extended period of time [wa]s necessary to protect society from [Defendant's] unwillingness to lead a productive life[] and [Defendant's] resort to criminal activity in furtherance of an anti-societal lifestyle." The trial court also found that "the aggregate length of the sentences reasonably relate[d] to the offenses for which [Defendant] [was] convicted." The trial court noted that Defendant was adjudicated delinquent for aggravated robbery as a juvenile and that he was on probation for reckless endangerment at the time of the offenses; thus, Defendant was sentenced to an offense that was committed while he was on probation. Further, the trial court found that Defendant was "an offender whose record of criminal activities [wa]s extensive[]" based on "his juvenile aggravated robberies, his three prior convictions before this one and then adding the four convictions in this case to it." The trial court also considered Defendant's potential for rehabilitation and noted that Defendant was given opportunities to rehabilitate by the juvenile court. Regarding the manner of service, the trial court denied probation "based upon the fact that he committed these while he was on probation and based upon his extensive record . . . ."

Defendant filed a motion for new trial, which the trial court denied. Defendant timely appeals the trial court's judgments.

*Analysis*

**Sufficiency of the Evidence**

Defendant argues that the evidence admitted at trial was insufficient for a rational juror to have found Defendant guilty beyond a reasonable doubt of attempted second degree murder because none of the videos entered into evidence depicted the shooting and because "[i]t is not clear whether the gun discharged because the victim was reaching for it, or whether [Defendant] intentionally pulled the trigger." The State asserts that "[Mr.] Campbell testified that he never touched [Defendant]'s gun and that [Defendant] pulled the trigger[]" and that "the circumstances of the shooting indicated that [Defendant] called out [Mr.] Campbell, followed him, and intended to kill him."

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the

evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2015). "Second degree murder is a result of conduct offense and accordingly, [t]he nature of the conduct that causes death or the manner in which one is killed is inconsequential under the second degree murder statute." *State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010) (quoting *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)) (internal quotation marks omitted). Our code states that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2015). A defendant attempts to commit an offense when "acting with the kind of culpability otherwise required for the offense[,]" they "[a]ct[] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2) (2015).

Whether the appellant "knowingly" attempted to kill his victim is a question of fact for the jury. Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.

*State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2001) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The evidence, when viewed in the light most favorable to the State, shows that, after Mr. Campbell and Ms. Floyd left the Yellow Store, Defendant called to them and approached them. Defendant pulled out his gun, and Mr. Campbell and Ms. Floyd began walking backwards down the sidewalk. Defendant attempted to hit Ms. Floyd with a glass bottle to get her to move away, and Ms. Floyd and Mr. Campbell fell. Mr. Campbell stood up and reached for the gun, and Defendant shot Mr. Campbell. Our court has consistently held that the "deliberate firing of shots at a person constitutes 'knowing' conduct for the purpose of establishing second degree murder." *State v. Tommy Dale Adams*, No. M2013-01080-CCA-R3-CD, 2014 WL 3565987, at *20 (Tenn. Crim. App. July 21, 2014), *perm. app. denied* (Tenn. Dec. 17, 2014); *see also State v. Dontavious Hendrix*, No. W2015-01671-CCA-R3-CD, 2016 WL 3922939, at *5 (Tenn. Crim. App. July 15, 2016), *perm. app. denied* (Tenn. Nov. 22, 2016); *State v. Montez Davis*, No. E2011-02055-CCA-R3-CD, 2012 WL 6213520, at *11 (Tenn. Crim. App. Dec. 13, 2012), *perm. app. denied* (Tenn. Apr. 10, 2013); *State v. Chancy Jones*, No.W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *10 (Tenn. Crim. App. Apr. 5, 2012), *perm. app denied* (Tenn. Aug. 16, 2012); *State v. Antonio Sellers*, No. W2011-00971-CCA-

R3CD, 2012 WL 1067213, at \*7 (Tenn. Crim. App. Mar. 27, 2012); *State v. Rickie Reed*, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at \*6 (Tenn. Crim. App. Oct. 31, 2002), *perm. app. denied* (Tenn. Mar. 17, 2003). The jury viewed all the evidence, including the three surveillance videos, and clearly chose to credit the testimony of Mr. Campbell above that of Defendant, as was its prerogative. "In the resolution of questions of fact, such as those presented by evidence of alibi or the identity of the perpetrator, 'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 297 (Tenn. 1993)). We conclude that there was sufficient evidence introduced at trial for a reasonable juror to have found Defendant guilty of attempted second degree murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

**Admission of Evidence**

### Past Fight

Defendant contends that the trial court erred in admitting testimony regarding the fact that Defendant and victim Campbell had a "fight" or "altercation" approximately a year and a half before the offense because the evidence was more prejudicial than probative. The State responds that the "fight" was only mentioned briefly during Defendant's cross-examination of victim Campbell and that the trial court "then responded to that unexpected mention in a way that avoided highlighting the testimony—as [Defendant] desired—and the testimony never came up again."

It is well-established precedent "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must

determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

During a jury-out hearing, Mr. Campbell explained that, prior to the offense date, he and Defendant had "an altercation" at Mr. Campbell's cousin's house because Defendant and another individual were attempting to steal money from Mr. Campbell. He stated that he and Defendant "got to fighting[,]" but he had not had any contact with Defendant between the altercation and the current offense. On cross-examination, Mr. Campbell testified that the altercation with Defendant occurred approximately a year and a half before the offense. He stated that he did not file a police report after his altercation with Defendant. Mr. Campbell stated that, when he was hospitalized after the offense, he remembered Defendant's face as his attacker but could not remember Defendant's name until his cousin stated that it was Defendant who shot him.

The trial court found that there was clear and convincing evidence that Mr. Campbell and Defendant had a confrontation at Mr. Campbell's cousin's house. The trial court found that this evidence was relevant to "the issue of identity in the sense that it supports the fact that . . . [Mr. Campbell has] seen this person before[]" and to the issue of Defendant's motive. The trial court noted that Defendant's indicted offense, attempted first degree murder, was a specific intent crime, which weighed in favor of finding the evidence more probative than prejudicial. The trial court also noted that the altercation occurred eighteen months before the offense and that the altercation involved stealing money, which weighed against the probative value of the evidence. The trial court then stated the following:

> I think the way I'm going to resolve this is[:] it's kind of splitting the baby. I think the prejudicial [e]ffect outweighs the probative value as far as getting into any of the details of the alleged theft. If I recall his testimony it was an attempted theft. He never . . . got it out of his pocket. They had a little . . . altercation. Having an altercation is not necessarily a[] crime or a

bad act. I think what I'm going to do is split the baby in this, sterilize it somewhat. . . . [L]et him testify that a year and a half before they had an altercation at his cousin's house with this particular individual. But . . . unless y'all bring it out, I think I'm in agreement with [trial counsel] that . . . I don't even want y'all getting into who started it because then we get into a bad act. If we just say they had an altercation at the cousin's house a year and a half before, then I think that's okay. So that's how I'm going to resolve that.

The trial court also informed the State and trial counsel that they could lead Mr. Campbell during his testimony to "avoid him volunteering something . . . ."

During the cross-examination of Mr. Campbell, trial counsel asked Mr. Campbell to look at the preliminary hearing transcript. In a discussion on whether trial counsel could impeach Mr. Campbell's testimony with the transcript, the trial court noted that the State had not asked Mr. Campbell any questions about his altercation with Defendant and that, if trial counsel asked about the altercation, "then they open the door." After a recess, the following exchange occurred:

> [TRIAL COUNSEL]: Mr. Campbell, how long were you in the hospital?
>
> [MR. CAMPBELL]: I'll say about . . . three weeks.
>
> [TRIAL COUNSEL]: Okay. And you talked to your family about what happened?
>
> [MR. CAMPBELL]: After. You know, some -- somewhat. It wasn't just talk to them. . . . I couldn't just talk to nobody.
>
> [TRIAL COUNSEL]: Is that a yes or a no?
>
> [MR. CAMPBELL]: Not really. I can't just say [be]cause I did talk to certain people that came to see me, but it wasn't about this situation. It wasn't about this. Only one time it was and that's when, you know – I'll just wait you ask me that question.
>
> [TRIAL COUNSEL]: So is that a yes or a no?
>
> [MR. CAMPBELL]: You can say yes.

[TRIAL COUNSEL]:  And they showed you pictures?

[MR. CAMPBELL]:  My family wasn't . . . the first ones to show me pictures.  I seen [sic] pictures before.  My cousin who [sic] house we got to fighting at before -- before she came.  But before she came –

. . . .

[TRIAL COUNSEL]:  He just said it.

[TRIAL] COURT:  What?

[TRIAL COUNSEL]:  He said that that's the one that I got in the fight with.

[TRIAL] COURT:  I heard that one word, but I'm not sure -- it was so muttered I'm not sure what -- what do you want me to do?

[TRIAL COUNSEL]:  Can you make an instruction on that?  I mean, I don't want to bring attention to it but it has -- a bell has been rung.

[ASSOCIATE TRIAL COUNSEL]:  He actually said exactly what we were trying to prevent.

[TRIAL COUNSEL]:  That's why I didn't go back to the question.

[TRIAL] COURT:  So what do y'all want me to do?  [A]nything I say is going to highlight it.

[ASSOCIATE TRIAL COUNSEL]:  Of course it is.  I don't know [if] there's pretty much anything you can do.

[TRIAL] COURT:  I mean I ruled it was admissible and that [the State] could have got into it but she didn't choose to and now he's volunteering it, unresponsively.  So I don't know what y'all -- I mean I don't know what to –

. . . .

[TRIAL] COURT:  It was so muttered I don't know.  I'll do whatever you want me to do.

- 12 -

[ASSOCIATE TRIAL COUNSEL]: Well, we don't want him to say it again.

. . . .

[TRIAL] COURT: Well, he hasn't done anything inadmissible. It's just that we hadn't got there and it would be nice not to go there.

[ASSOCIATE TRIAL COUNSEL]: Right.

[TRIAL] COURT: But I'll do whatever you want me to do.

[ASSOCIATE TRIAL COUNSEL]: (Indiscernible) let it go.

[TRIAL] COURT: Unresponsive to the question. That will explain why y'all are up here.

Here, the trial court complied with the requirements of Tennessee Rule of Evidence 404(b) by holding a jury-out hearing, by determining that a material issue existed regarding the identity and motive of Defendant, by finding that proof of Defendant's altercation was clear and convincing, and by limiting the admission of the evidence due to prejudice. The trial court ruled that Mr. Campbell could testify that he had an altercation with Defendant approximately a year and one-half prior to the offenses, but the trial court specifically ruled that Mr. Campbell could not discuss the underlying details of the altercation because the prejudice of that evidence would outweigh the probative value.

We conclude that the trial court did not err. We note that Mr. Campbell mentioned general details of the altercation (there was "fighting") in testimony that was unresponsive to trial counsel's question on cross-examination; when this occurred, the trial court instructed the witness to stop giving unresponsive answers. It is also clear that the underlying facts of the altercation, that Defendant was allegedly attempting to steal money from Mr. Campbell, were not mentioned at trial. Trial counsel's proposed remedy to "let it go" was the course taken by the trial court. Defendant is not entitled to relief on this issue.

### *Third Surveillance Video*

Defendant additionally argues that the trial court erred in admitting the third surveillance video because it was not properly authenticated by the State. More

- 13 -

specifically, Defendant notes that the State admitted the video through the testimony of Mr. Campbell, who did not record the video and was not depicted in the video. The State contends that the trial court did not abuse its discretion in admitting the video because "[Mr.] Campbell's testimony was adequate to show that the video was what the State purported it to be: a video of [Defendant] standing outside Mike's Store on June 14, 2015, before the shooting."

Tennessee Rule of Evidence 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Evidence may be authenticated by a witness's testimony that "a matter is what it is claimed to be[]" or by "[c]omparison by trier of fact or by expert witnesses with specimens which have been authenticated." Tenn. R. Evid. 901(b)(1),(3).

The following exchange occurred at trial during Mr. Campbell's testimony:

[TRIAL COUNSEL]: Your Honor, he cannot properly authenticate this video. I mean, his back was turned. You can't even see what's happening in this video. This happened way down at the other [end]. And when he came out the store whatever is going on, he can't see it. He's not even in this video. He can't properly authenticate it. It's not a matter within his knowledge.

. . . .

[THE STATE]: . . . [D]o you recognize this area?

[MR. CAMPBELL]: This is Mike's Store, the store beside the Yellow Store.

. . . .

[THE STATE]: . . . [I]f we're facing Yellow Store, where is this store located?

. . . .

[MR. CAMPBELL]: To the left of the Yellow Store. If you trying to enter the Yellow Store or coming out the Yellow Store?

[THE STATE]: Going in?

- 14 -

[MR. CAMPBELL]:  It's to the right.

. . . .

[MR. CAMPBELL]:  Yes, ma'am.  That'[s] . . . [when] my name was called.

[THE STATE]:  Is that when you were out of the store you heard hey, Larry?

[MR. CAMPBELL]:  Yes, ma'am.

[THE STATE]:  There, is that when you heard other things being said to you?

[MR. CAMPBELL]:  Yes, ma'am.

[THE STATE]:  Does that clothing match the person who shot you?

[MR. CAMPBELL]:  Yes, ma'am.

[THE STATE]:  Is that the person who shot you?

[MR. CAMPBELL]:  Yes, ma'am.

[THE STATE]:  Is that right next to where you were shot?

[MR. CAMPBELL]:  Down the street, yes, ma'am.

[THE STATE]:  Is that the same night you were shot?

[MR. CAMPBELL]:  Yes, ma'am.

[TRIAL] COURT:  Of course the obvious question is how does he know it's the same night he was shot?

. . . .

[MR. CAMPBELL]:  Sir, you can see he called me that night.  Like, when I was coming out of the store I was called.  And that's the same thing

- 15 -

he had on that night. . . . [T]hat [was] my first time seeing him over in the neighborhood before that.

. . . .

[TRIAL COUNSEL]: [I]n your previous testimony you testified that you were down the street when you heard your name called the first time; is that correct?

[MR. CAMPBELL]: Yes, ma'am.

[TRIAL COUNSEL]: And I believe it was your testimony that you didn't know who it was because they were too far away?

[MR. CAMPBELL]: Yes, ma'am.

[TRIAL COUNSEL]: So how do you know that that's who it was?

[MR. CAMPBELL]: He came running down the street.

[TRIAL COUNSEL]: How do you know that this was the same night?

[MR. CAMPBELL]: That's the same night. I remember that night, ma'am.

. . . .

[TRIAL] COURT: All right. Well, I think I'm going to allow it into evidence under . . . 901(B)3. I think he has some knowledge of it, but you're right. He doesn't have complete knowledge of it. But he has some knowledge under (B)l, testimony of a witness with knowledge. But primarily I'm letting it in under Subparagraph 3. Comparison by trier of fact with specimens which have already been authenticated. I think when you look at the other exhibit that I looked at, I think the jury can compare that with that and make a decision about it.

The trial court noted that two other surveillance videos had been authenticated and admitted into evidence. The trial court admitted the third surveillance video under Tennessee Rule of Evidence 901(b)(3) "to let the jury compare that with this which looks like it just shows a different angle from a far[-]away place."

Here, Mr. Campbell had sufficient personal knowledge of the individual depicted on the third surveillance video. He identified Defendant based on the clothing that Defendant wore on the video, and he also identified the location and timing of the video based on his recollection of the offense. Mr. Campbell was able to pinpoint the moment on the video that Defendant first called to Mr. Campbell to get his attention. We conclude that the trial court did not abuse its discretion by admitting the third surveillance video under Tennessee Rule of Evidence 901(b)(1). *See State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996) (concluding that photographs from surveillance video were properly admitted through the victim, who testified that the photographs accurately depicted the scene); *see also State v. Jeffrey Scott Long*, No. E2015-01287-CCA-R3-CD, 2017 WL 2958700, at *20 (Tenn. Crim. App. July 11, 2017) (concluding that surveillance video was admissible under Tennessee Rule of Evidence 901(b)(1) through the testimony of the building maintenance worker because the witness observed the defendant at the apartment complex on the night of the offense and testified that the video was an accurate depiction), *no perm. app. filed*.

Regarding the admission of the video under Tennessee Rule of Evidence 901(b)(3), we conclude that the trial court incorrectly relied on this provision. It appears to the court that case law in Tennessee limits the admission of evidence under this provision to "exemplars and questioned documents." Tenn. R. Evid. 901(b)(3), Advisory Comm'n Cmts. Previous opinions from the intermediate appellate courts in Tennessee have only admitted evidence of an individual's handwriting or signature under this provision, *see, e.g.*, *Payne v. Tipton County*, 448 S.W.3d 891, 901-02 (Tenn. Ct. App. Mar. 31, 2014); *James A. Long, et al., v. Charles D. Ledford, et al.*, No. E2016-00451-COA-R3-CV, 2016 WL 5851875, at *3 (Tenn. Ct. App. Sept. 30, 2016), *perm. app. denied* (Tenn. Jan. 19, 2017); *State v. Gregory D. Roberts*, No. W2010-01538-CCA-R3-CD, 2011 WL 1220097, at *3 (Tenn. Crim. App. Mar. 30, 2011), *no perm. app. filed*; *State v. William S. Dedmon*, No. 01C01-9506-CC-00209, 1996 WL 518274, at *4 (Tenn. Crim. App. Sept. 13, 1996), so this provision is inapplicable to the current case. In any event, any error in admitting the video under this provision is harmless because Mr. Campbell had sufficient knowledge and gave adequate testimony to admit the video under Rule 901(b)(1). Defendant is not entitled to relief on this ground.

**Consecutive Sentencing**

Defendant argues that the trial court erred in ordering that Defendant's aggravated assault sentence run consecutively to his attempted second degree murder sentence because the trial court did not base its decision on testimony or evidence introduced at trial and because "there were no aggravating circumstances to justify consecutive sentencing." The State responds that the trial court did not abuse its discretion because

"the trial court had three separate grounds for consecutive sentencing, and it articulated a reasoned basis for why each of those grounds applied here."

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Likewise, the "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences delineated in Tennessee Code Annotated section 40-35-115(b). *Id.* at 861.

Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). When the trial court bases its decision to run sentences consecutively on the dangerous offender category in Tennessee Code Annotated section 40-35-115(b)(4), it must make additional findings as set out in *State v. Wilkerson*: that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)). If the trial court fails to make the requisite findings, the appellate court may either conduct a de novo review to determine whether there is an adequate basis for the imposition of consecutive sentences or remand to the trial court so that it may consider the appropriate factors and make the proper findings. *Id.* at 864.

Here, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and who showed no hesitation about committing a crime to which the risk to human life is high and that there were aggravating circumstances based on Mr. Campbell's injuries. The trial court found that consecutive sentencing was necessary to protect society and that "the aggregate length of the sentences reasonably relate[d] to the offense for which the [D]efendant [was] convicted." The trial court also found that Defendant had an extensive criminal history, that he had not successfully completed past alternative sentences, and that he committed the current offenses while on probation.

Because the trial court set out its findings and conclusions regarding its order of consecutive sentencing on the record, we will afford its conclusion a presumption of reasonableness, and we will not reverse absent an abuse of discretion. We agree with the

State that the trial court did not abuse its discretion by ordering Defendant to serve consecutive sentences. The trial court ordered consecutive sentencing based on several factors from Tennessee Code Annotated section 40-35-115, all of which were supported by evidence in the record. Defendant is not entitled to relief on this ground.

## CONCLUSION

Based on the aforementioned reasons, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE